UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| GINA LYNN PETRONE-KNECHTEL, | ) | Civil Action No.: 4:18-cv-002383-TER |
| | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| | ) | |
| -vs- | ) | |
| | ) | |
| ANDREW M. SAUL, | ) | |
| Commissioner of Social Security; | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of Social Security, denying Plaintiff's claim for a period of disability and disability insurance benefits (DIB). The only issues before the Court are whether the findings of fact are supported by substantial evidence and whether proper legal standards have been applied. This action is proceeding before the undersigned by voluntary consent pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. Proc. R. 73.

## I. RELEVANT BACKGROUND

### A.     Procedural History

Plaintiff filed an application for DIB on August 3, 2012, alleging inability to work since July 12, 2011. (Tr. 13). Her claims were denied initially and upon reconsideration. Thereafter, Plaintiff filed a request for a hearing. A hearing was held on July 28, 2014, at which time Plaintiff and a vocational expert (VE) testified. (Tr. 37). The Administrative Law Judge (ALJ) issued an unfavorable decision on October 2, 2014, finding that Plaintiff was not disabled within the meaning of the Act. (Tr. 13-30). Plaintiff filed a request for review of the ALJ's decision, which the Appeals

Council denied on January 14, 2016, making the ALJ's decision the Commissioner's final decision. (Tr. 1-4). Plaintiff filed an action in this court on March 10, 2016. On July 7, 2017, this action was remanded. (Tr. 1005). On March 21, 2018, another hearing was held. Plaintiff amended the alleged onset date to August 3, 2012. (Tr. 886). On June 25, 2018, the Administrative Law Judge (ALJ) issued an unfavorable decision, finding that Plaintiff was not disabled within the meaning of the Act. (Tr. 909). Plaintiff did not file exceptions and bypassed the Appeals Council in accordance with applicable regulations. On August 28, 2018, this action was filed. (ECF No. 1).

**B.    Plaintiff's Background and Medical History**

**1.    Introductory Facts**

Plaintiff was born on July 6, 1968, and was forty-six years old on the date last insured. (Tr. 907). Plaintiff completed her education through at least high school and has past relevant work experience as a network control operator. (Tr. 907). Plaintiff alleges disability originally due to chronic back pain, osteoarthritis, IBS, carpal tunnel syndrome, ganglion cysts, herniated discs, and migraines. (Tr. 103).

**2.    Medical Records and Opinions**

As Plaintiff's arguments are focused on Listing 1.04A and Dr. Melba's opinions, medical records regarding other impairments not at issue, such as mental health and migraine treatment records, will not be fully summarized here.

**Records Prior to Onset Date**

Plaintiff's history with Dr. Melba dates back to at least 2003. (Tr. 413). Plaintiff reported back pain in 2006. (Tr. 400).

On November 15, 2010, Plaintiff's thoracic MRI showed: disc herniations and cord

2

compressive effects at T6-T12. (Tr. 781-82). The cervical spine MRI showed no disc herniation. (Tr. 783). In December 2010, Plaintiff reported to mental health that she had been referred to pain management due to her inoperable back. (Tr. 688).

Plaintiff's April 7, 2011 lumbar spine CT scan showed: mild end plate degenerative changes appreciated at all levels with mild posterior disc bulging at the L4-5 and L5-S1 levels, no definite stenosis detected, and could consider more sensitive imaging like MRI. (Tr. 779). There was a similar finding for the thoracic spine CT. (Tr. 780).

On May 10, 2011, Plaintiff was seen by Dr. Thiyaga of Spine and Pain Care, referred by Dr. Vanpelt, with complaints of back pain. (Tr. 455). Plaintiff was tender over T4-T11. (Tr. 458). Diagnoses noted were: degeneration of thoracic or thoracolumbar intervertebral disc, chronic pain syndrome, lumbago, and migraine without aura. MRI of thoracic spine showed "multiple ddd and hnp from t6 to t12 with ant cord denting." Plaintiff was prescribed opioid maintenance therapy for chronic intractable pain. Plaintiff reported that her pain increasingly affected her daily activities and that she had tried a multitude of treatment options without significant improvement. Plaintiff indicated she was leaving the next day for Scotland and wanted stronger medication to help her travel. (Tr. 460). Plaintiff was seen again on June 3, 2011, with reports that her pain was a level five and was relieved with medication by 40%. (Tr. 461).

On June 29, 2011, Plaintiff was seen by Dr. Thiyaga with a pain level of six, and after medication, her pain was relieved by 30%. (Tr. 475). "Opioids seems to help her improve functions." (Tr. 479). On July 27, 2011, Plaintiff was seen by Dr. Thiyaga with a pain level of six, and after medication, her pain was relieved by 20%. She had been increasing Percocet to control the pain. She requested a less potent medication for when she drives. (Tr. 483).

Plaintiff generally attended physical therapy twice a week; it appears therapy started in 2010. On August 15, 2011, Plaintiff reported to her physical therapist general pain levels of 6-8 in her thoracic and lumbar regions. Plaintiff had a motor vehicle accident in June 2010. (Tr. 282). Plaintiff had made progress with strength and exercise tolerance but not in decreasing pain levels which limited her activity tolerance. (Tr. 283).

As a result of other litigation, Plaintiff was evaluated on August 10, 2011, by Dr. Rana and assigned 40% impairment to the thoracic spine and 11% impairment to the lumbar spine. (Tr. 878).

On August 24, 2011, Plaintiff was seen by Dr. Thiyaga with a pain level of 3, and after medication, her pain was relieved by 50%. (Tr. 490). Plaintiff's "sleep and work improved going to school, PT at smith therapy helping." (Tr. 493).

On September 6, 2011, Plaintiff reported that her back was causing pain down her leg, but her physical therapist noted that she tolerated treatment well and had no difficulty with exercises. (Tr. 279). On September 21, 2011, Plaintiff was seen by Dr. Thiyaga with a pain level of 4 and her pain was relieved by 40% after medication . (Tr. 496).

On October 3, 2011, Plaintiff had difficulty with some physical therapy exercises due to low back pain. (Tr. 275). On October 10, 2011, Plaintiff still reported symptoms but tolerated exercises well. (Tr. 274).

In a October 2011 note, Plaintiff's gastroenterologist indicated under history: Plaintiff was followed by Dr. Thiyaga for pain management after a car accident resulting in 6 herniated discs and two bulging discs, plantar fasciitis, and whiplash. (Tr. 302).

On October 19, 2011, Plaintiff was seen by Dr. Thiyaga with a pain level of 5, and after medication, her pain was relieved by 40%. (Tr. 503). "For some reason, she is not interested in non-

opioids... She is aware that we don't escalate pain meds if and when new pain arises.  Again she insists that we should."  (Tr. 507).

On October 24, 2011, Plaintiff's physical therapist reported that sitting seemed to exacerbate Plaintiff's symptoms. (Tr. 272).  On October 31, 2011, Plaintiff reported improvement with physical therapy and feeling better overall slowly.  (Tr. 271).

On November 14, 2011, Plaintiff was seen by Dr. Thiyaga with a pain level of 6, and medication relieved her pain by 30%.  (Tr. 511).  "Lifting things, bending, standing, and walking increases her pain."  Plaintiff had thoracic tenderness upon exam. (Tr. 513).

On November 18, 2011, Plaintiff was seen by Dr. Melba with complaints of shoulder pain and back pain.  (Tr. 363, 617).  Plaintiff was referred to physical therapy for her shoulder; medications were refilled.  (Tr. 364-65).

On November 29, 2011, Plaintiff presented to Smith Therapy Services for physical therapy for shoulder pain.  Plaintiff reported a pain level of five to eight.  (Tr. 266).

On December 1, 2011, Plaintiff completed aquatic exercises and avoided rotational movement of right shoulder due to pain.  (Tr. 265).

On December 12, 2011, Plaintiff was seen by Dr. Thiyaga with a pain level of 5, and after medication, her pain was relieved by 50%.  (Tr. 517).  Plaintiff insisted "her treatment would be more effective with more injections."  Upon exam, Plaintiff had normal sensation, negative leg raise, positive reflexes, extension was limited worse than flexion due to pain, and lateral rotation was limited on right and left due to pain. (Tr. 520). Plaintiff was tender over paravertebral muscles at T4-11. (Tr. 519).

On December 14, 2011, Plaintiff did surprisingly well with yoga poses and stretches without

pain. (Tr. 264).

On December 19, 2011, Plaintiff was seen by Dr. Melba with complaints of shoulder pain from lifting a book bag. (Tr. 360, 614). Review of systems indicated "continues PT for the neck". Plaintiff was diagnosed with stable cervicalgia. (Tr. 361). Plaintiff received injections.

On December 27 and 29, 2011, Plaintiff completed aquatic exercises with good tolerance and effort. (Tr. 262-63).

**2012**

On January 3, 2012, Plaintiff was seen by Dr. Melba for shoulder pain. (Tr. 358, 612). Plaintiff had been going to physical therapy and pain management, but her shoulder had worsened after helping someone out of a pool. (Tr. 358). Plaintiff was referred again to physical therapy. (Tr. 359). On January 3, 2012, Plaintiff did not perform exercise at physical therapy due to a shooting pain in her shoulder. (Tr. 261).

On January 10, 2012, Plaintiff reported to her physical therapist that she fell and her right shoulder was really painful. (Tr. 260). On January 11, 2012, Plaintiff was seen by Dr. Thiyaga with a pain level of 4, and after medication, her pain was relieved by 40%. (Tr. 523). On January 12, 2012, Plaintiff's physical therapist noted that Plaintiff felt her shoulder pain was somewhat better. Plaintiff tolerated the aquatic exercises well. (Tr. 259).

On February 13, 2012, Plaintiff was seen by Dr. Thiyaga with a pain level of 8, and after medication, her pain was relieved by 10%. (Tr. 530). Plaintiff stated that a "shot and different rx would make treatment more effective. [She] ran out of meds this month." (Tr. 530).

On March 12, 2012, Plaintiff was seen by Dr. Thiyaga with a pain level of 7, and after medication, her pain was relieved by 30%. Plaintiff stated that she wished to continue her pain

medications. (Tr. 343, 537).

On April 9, 2012, Plaintiff was seen by Dr. Thiyaga. Plaintiff reported that her medication was not helping her pain. (Tr. 336). She had a pain level of eight. (Tr. 544). MS-Contin was discontinued, and Lortab and a Butrans patch were prescribed. (Tr. 337). On May 7, 2012, Plaintiff was seen by Dr. Thiyaga with a pain level of 7, and treatment provided a 20% reduction. (Tr. 565). Her pain was in her back and lower leg. On June 4, 2012, Plaintiff was seen by Dr. Thiyaga with a pain level of 6 with 50% relief with treatment. (Tr. 572).

On June 25, 2012, Plaintiff was seen by Dr. Thiyaga with a pain level of 5 with 50% relief. Plaintiff described the pain as sharp and shooting in her lower back, right shoulder, neck, and knee. (Tr. 579). Plaintiff's prescription for Percocet was refilled. (Tr. 583).

On July 31, 2012, Plaintiff was seen by Dr. Thiyaga with a pain level of 6 with 60% relief. Plaintiff reported that she was able to function better due to the opioids. (Tr. 326, 586). Plaintiff's Percocet was refilled. (Tr. 327). Upon exam, Plaintiff had tenderness over paravertebral muscles at T4-11, had positive trigger points in some muscles, had 5/5 strength, normal sensation, negative leg raise, positive reflexes, and limited extension and rotation of thoracic and lumbar spine. (Tr. 589).

**Records after amended alleged onset date**

Plaintiff's amended alleged onset date was August 3, 2012. (Tr. 889, 1189).

On August 31, 2012, Plaintiff was seen by Dr. Christopher Vanpelt, M.D. (Tr. 319). Dr. Vanpelt noted that he had seen Plaintiff in 2010 for back pain. He noted her cervical and lumbar MRIs were fairly unremarkable, but her thoracic MRI showed multiple large disc herniation and multiple areas of spinal cord compression. Plaintiff received a thoracic epidural steroid injection

from Dr. Blackwell that provided two weeks of relief, but she had a spinal headache afterwards. Dr. Vanpelt noted that Plaintiff had no trouble with ambulation and had a pain level of 7. (Tr. 319). Only the MRI cervical and lumbar images were thought to be "essentially age appropriate" results, not the thoracic images. (Tr. 320). Dr. Vanpelt indicated: "I think she is having spondylotic and discogenic thoracic pain due to the multiple thoracic disc herniations which were likely exacerbated or caused by the motor vehicle accident as stated above. This patient does have multiple level thoracic disc herniations with varying degree of thoracic spinal cord impingement rotation. If this were to be symptomatic, typically it would result in thoracic myelopathy including spasticity and incoordination with the lower extremities." (Tr. 320). Dr. Vanpelt recommended another thoracic MRI, but Plaintiff declined and requested a referral to MUSC for a second opinion. (Tr. 320). She was diagnosed with thoracic disc displacement. Upon exam, lumbar flexion was limited to 30 degrees secondary to pain, had mild tenderness along the paraspinal musculature, intact sensation, and intact reflexes. (Tr. 319). There was exacerbation of some symptoms with lumbar flexion; Plaintiff had negative straight leg raise. (Tr. 320).

On September 5, 2012, Plaintiff was seen by Dr. Thiyaga with a pain level of 6 with 50% relief. (Tr. 324, 593, 1290). Plaintiff reported that the medications were not helping her to remain functional. Plaintiff's physical examination was changed with more pain behavior with greater limitation of range of motion. (Tr. 597). Plaintiff reported exertional activities and sitting/standing/walking increased her pain. (Tr. 1284). Upon exam, Plaintiff had tenderness over paravertebral muscles at T4-T11 and non tender at iliac crest and SI joint line. Plaintiff had some positive tenderness/trigger points in muscles. (Tr. 1286). Plaintiff had 5/5 strength (Tr. 1287). Plaintiff had normal posture and antalgic gait. Plaintiff had positive reflexes, normal sensation, and

negative straight leg raise. (Tr. 1287). For the spine, extension was limited worse than flexion due to pain and lateral rotation was limited on both sides due to pain. Pain site was widening and intensity increased. (Tr. 1288). "I think the patient is able to function better because of the opioid therapy, and decided to extend." (Tr. 1288).

On September 28, 2012, Plaintiff was seen by Dr. Patel, M.D., of the Spine Clinic at MUSC. (Tr. 347). Plaintiff reported low back pain. Dr. Patel reviewed imaging studies and did not see compressive pathology. Plaintiff did have moderate degenerative L5-S1 disc with some facet arthropathy. Dr. Patel suggested injections and physical therapy. (Tr. 347). Plaintiff's review of systems was positive for headaches, dizziness, neck pain, depression, and back pain. (Tr. 348). She was referred to pain clinic and physical therapy. (Tr. 350).

On October 1, 2012, Plaintiff was seen by Dr. Thiyaga. Plaintiff reported pain in mid back, lower back, legs, calf numbness, neck pain, and right shoulder pain. Plaintiff reported pain level of 6 with 20% relief. "Patient reports a brace and injections could help improve treatment." (Tr. 1281, 1295). Upon exam, Plaintiff had tenderness over paravertebral muscles at T4-T11 and non tender at iliac crest and SI joint line. Plaintiff had some positive tenderness/trigger points in muscles. (Tr. 1281). Plaintiff had 5/5 strength (Tr. 1282). Plaintiff had normal posture and antalgic gait. Plaintiff had positive reflexes, normal sensation, and negative straight leg raise. (Tr. 1282). For the spine, extension was limited worse than flexion due to pain and lateral rotation was limited on both sides due to pain. Plaintiff "complains of spinal pain involving mid-lower lumbar spine and without significant pain in lower limb. Axial pain may be due to unusually degenerating disc in the lower thoracic spine(discogenic pain) or disc disease causing facet joint dysfunction(arthrogenic pain). In addition, disordered spinal biomechanics can cause muscle and soft tissue pain (myalgia). No dural

tension signs." (Tr. 1282-83). "She is opioid dependent." "She believes she is able to function better because of opioids and does not report serious side effects such as sedation, disorientation, [or] GI upset." (Tr. 1283).

On October 16, 2012, Dr. Thiyaga gave Plaintiff an injection at L3-S1. (Tr. 1277-79). Post-injection pain score was 2.

On October 29, 2012, Plaintiff was seen by Dr. Thiyaga. Plaintiff reported pain level of 4 with 50% relief. Plaintiff reported pain in her lower back, mid back, neck, and right knee. Upon exam, Plaintiff had tenderness over paravertebral muscles at T4-T11 and non tender at iliac crest and SI joint line. Plaintiff had some positive tenderness/trigger points in muscles. (Tr. 1274). Plaintiff had 5/5 strength (Tr. 1275). Plaintiff had normal posture and antalgic gait. Plaintiff had positive reflexes, normal sensation, and negative straight leg raise. (Tr. 1275). For the spine, extension was limited worse than flexion due to pain and lateral rotation was limited on both sides due to pain. "She is opioid dependent" "She believes she is able to function better because of opioids and does not report serious side effects such as sedation, disorientation, [or] GI upset." (Tr. 1275).

On November 8, 2012, Plaintiff presented to Piedmont Psychiatric Services. Her back pain and depression was improved. (Tr. 681).

On November 26, 2012, Plaintiff was seen by Dr. Thiyaga. Plaintiff reported pain level of 5 with 50% relief. Upon exam, Plaintiff had tenderness over paravertebral muscles at T4-T11 and non tender at iliac crest and SI joint line. Plaintiff had some positive tenderness/trigger points in muscles. (Tr. 1271). Plaintiff had 5/5 strength (Tr. 1272). Plaintiff had normal posture and antalgic gait. Plaintiff had positive reflexes, normal sensation, and negative straight leg raise. (Tr. 1272). For the spine, extension was limited worse than flexion due to pain and lateral rotation was limited on

both sides due to pain. "She is on opioids for control of intractable pain." "Physical exam findings have not changed much." (Tr. 1272). Plaintiff reported shots were still working well but she still required medication. (Tr. 1296).

On December 17, 2012, Plaintiff was seen by Dr. Thiyaga. Plaintiff reported pain level of 5 with 50% relief. Upon exam, Plaintiff had tenderness over paravertebral muscles at T4-T11 and non tender at iliac crest and SI joint line. Plaintiff had some positive tenderness/trigger points in muscles. (Tr. 1268). Plaintiff had 5/5 strength (Tr. 1269). Plaintiff had normal posture and antalgic gait. Plaintiff had positive reflexes, normal sensation, and negative straight leg raise. (Tr. 1269). For the spine, extension was limited worse than flexion due to pain and lateral rotation was limited on both sides due to pain. "Opioids seem to help her improve functions, though her pain score has not fluctuated much." (Tr. 1269). Plaintiff reported prior injections still seemed to be helping. (Tr. 1294).

## 2013

On January 2, 2013, Plaintiff was seen by PA Friddle of Piedmont Psychiatric Services. Plaintiff reported better moods and minimal anxiety with no complaints. (Tr. 1239). Gait was normal. Affect was bright.

On January 14, 2013, Plaintiff was seen by Dr. Thiyaga. Plaintiff reported pain level of 6 with 50% relief. Upon exam, Plaintiff had tenderness over paravertebral muscles at T4-T11 and non tender at iliac crest and SI joint line. Plaintiff had some positive tenderness/trigger points in muscles. (Tr. 1265). Plaintiff had 5/5 strength (Tr. 1266). Plaintiff had normal posture and antalgic gait. Plaintiff had positive reflexes, normal sensation, and negative straight leg raise. (Tr. 1266). For the spine, extension was limited worse than flexion due to pain and lateral rotation was limited on both

sides due to pain. "Opioids seem to help her improve functions, though her pain score has not fluctuated much." (Tr. 1266).

On February 2, 2013, Plaintiff was seen early with request for Clonazpam 4mg dose. (Tr. 1237). Gait was normal. Neurontin was continued for pain. (Tr. 1238).

On February 19, 2013, Plaintiff was seen by Dr. Thiyaga. Plaintiff reported pain level of 6 with 50% relief. Upon exam, Plaintiff had tenderness over paravertebral muscles at T4-T11 and non tender at iliac crest and SI joint line. Plaintiff had some positive tenderness/trigger points in muscles. (Tr. 1262). Plaintiff had 5/5 strength (Tr. 1263). Plaintiff had normal posture and antalgic gait. Plaintiff had positive reflexes, normal sensation, and negative straight leg raise. (Tr. 1263). For the spine, extension was limited worse than flexion due to pain and lateral rotation was limited on both sides due to pain. "She is on chronic opioid therapy for musculoskeletal pain, since other forms of treatment had not helped her regain function." "She still believes that opioids are helping her." (Tr. 1263). Percocet was prescribed. (Tr. 1261).

On February 26, 2013, Plaintiff was seen by neurologist Dr. Jain, M.D., referred by Dr. Melba, due to her leg going numb and falling a week prior. Plaintiff had seen three neurologists in the past. (Tr. 825, 1829). Under review of systems, Dr. Jain noted Plaintiff was positive for difficulty with routine tasks. (Tr. 826). Upon exam, strength testing showed 4/5 with giveway weakness on the left and sensation reduced to temperature on the left. Gait was antalgic. (Tr. 1831). Plaintiff was to get a physical therapy assessment. (Tr. 1831).

On March 19, 2013, Plaintiff was seen by Dr. Thiyaga. Plaintiff reported pain level of 5 with 50% relief. Plaintiff stated further injections may help her pain. Upon exam, Plaintiff had tenderness over paravertebral muscles at T4-T11 and non tender at iliac crest and SI joint line.

Plaintiff had some positive tenderness/trigger points in muscles. (Tr. 1259). Plaintiff had 5/5 strength (Tr. 1260). Plaintiff had normal posture and antalgic gait. Plaintiff had positive reflexes, normal sensation, and negative straight leg raise. (Tr. 1260). For the spine, extension was limited worse than flexion due to pain and lateral rotation was limited on both sides due to pain. "She is on opioids for control of intractable pain." (Tr. 1260). Plaintiff stated the benefits were much greater than any side effects. "She is able to function because of current medical management of pain." (Tr. 1260). Percocet was prescribed. (Tr. 1261).

On April 2, 2013, Plaintiff was seen by PA Friddle. (Tr. 1235). Plaintiff reported her medications were working well and she had no complaints. Exam was same as July 2013. (Tr. 1235). Gait was normal. (Tr. 1235).

On May 17, 2013, Plaintiff was seen by Dr. Thiyaga. Plaintiff reported neck, mid back, and low back pain level of 7. Upon exam, Plaintiff had tenderness over paravertebral muscles at T4-T11 and non tender at iliac crest and SI joint line. Plaintiff had some positive tenderness/trigger points in muscles. (Tr. 1256). Plaintiff had 5/5 strength (Tr. 1257). Plaintiff had normal posture and antalgic gait. Plaintiff had positive reflexes, normal sensation, and negative straight leg raise. (Tr. 1257). For the spine, extension was limited worse than flexion due to pain and lateral rotation was limited on both sides due to pain. "She is on opioid maintenance therapy for chronic intractable pain." (Tr. 1257).

On June 25, 2013, Plaintiff was seen by Dr. Thiyaga. Plaintiff reported pain level of 7 with 40% relief from treatment. Upon exam, Plaintiff had tenderness over paravertebral muscles at T4-T11 and non tender at iliac crest and SI joint line. Plaintiff had some positive tenderness/trigger points in muscles. (Tr. 1253). Plaintiff had 5/5 strength (Tr. 1254). Plaintiff had normal posture and

antalgic gait. Plaintiff had positive reflexes, normal sensation, and negative straight leg raise. (Tr. 1254). For the spine, extension was limited worse than flexion due to pain and lateral rotation was limited on both sides due to pain. (Tr. 1254). "Opioids seem to help her improve functions, though her pain score has not fluctuated much. She does not have signs of over sedation." (Tr. 1254).

On July 2, 2013, Plaintiff was seen by PA Friddle. (Tr. 1233). Plaintiff reported her medications were working well and she had no complaints. Upon exam, affect was bright, but mood a bit anxious/irritable. "Seeks gain from sick role." (Tr. 1233). Plaintiff had no cognitive deficits with normal concentration; gait was normal. (Tr. 1233).

On August 5, 2013, Plaintiff was seen by Dr. Thiyaga. Upon exam, Plaintiff had tenderness over paravertebral muscles at T4-T11 and non tender at iliac crest and SI joint line. Plaintiff had some positive tenderness/trigger points in muscles. (Tr. 1251). Plaintiff had 5/5 strength (Tr. 1249). Plaintiff had normal posture and antalgic gait. Plaintiff had positive reflexes, normal sensation, and negative straight leg raise. (Tr. 1251). For the spine, extension was limited worse than flexion due to pain and lateral rotation was limited on both sides due to pain. (Tr. 1252). Plaintiff complained of unsteady posture and lumbar spine range of motion; a brace was advised. (Tr. 1252).

On August 27, 2013, Plaintiff was seen by Dr. Melba who noted that Plaintiff presented with:

> back pain to the S1 joint, lumbar spine and lower thoracic spine radiating to the L hip which occurred years ago. The patient characterized it as aching pain. The patient described the severity of the injury as no better. [C]ontinues chiropractor/PT. The timing is gradual onset. Relieving factors were reported to be: minimal with pt, chiropractor. An associated sign and symptom is [n]one. [R]eports seen at MUSC by neurosurgery and told it was intractable. [C]ontinues to see pain mgt. [and] is seeking disability[.] I don't have much in the way of records at this point to substantiate her claim.
> ...
> Has been dealing with back pain for over 3 years now. She had been under pain mgt care during this time as well. [H]as disability hearing coming up and needs forms

14

> filled out. I agreed to review her old records and will request from pain mgt. probably has true intractable back pain that is inoperable, will get records and review

(Tr. 860, 863). Examination showed pain with bending and unable to flex laterally. (Tr. 863). Assessment was "common migraine without mention of intractable migraine, new," depression, low back pain, and restless legs syndrome.

On September 9, 2013, Plaintiff was seen by Dr. Thiyaga. Plaintiff reported pain level of 7 and reported 40% of pain relief with treatment. (Tr. 1248). Upon exam, Plaintiff had tenderness over paravertebral muscles at T4-T11 and non tender at iliac crest and SI joint line. Plaintiff had some positive tenderness/trigger points in muscles. (Tr. 1248). Plaintiff had 5/5 strength (Tr. 1249). Plaintiff had normal posture and antalgic gait. Plaintiff had positive reflexes and negative straight leg raise, and normal sensation. (Tr. 1249). For the spine, extension was limited worse than flexion due to pain and lateral rotation was limited on both sides due to pain. (Tr. 1249). Notes under assessment indicate MRI of thoracic showed multiple degenerative disc disease from T6-12 with anterior cord denting, mild disease at L5/S1 and bulging disc at C3-6. (Tr. 1249). "She is on opioid maintenance therapy for chronic intractable pain." (Tr. 1249). Plaintiff reported she saw someone in waiting room with a TSLO and insists she needs one. Plaintiff was explained that a TLSO was very uncomfortable and was for a compression fracture for a brief period of time and not for chronic back pain. "Patient is exaggerating her symptoms, wants services she does not need." (Tr. 1249). Plaintiff was prescribed Neurontin, Percocet, and Zanaflex. (Tr. 1250).

On September 11, 2013, Plaintiff was seen by Dr. Melba. He noted:

> back pain to the S1 joint, lumbar spine and lower thoracic spine radiating to the L hip, which resulted mva, and which occurred following MVA 2010. The patient characterized it as aching pain. The patient described the severity of the injury as unable to sit for more than a few minutes, requires chronic narcotic treatment. The

timing is gradual onset. The following were described as aggravating factors: movement. Relieving factors were reported to be: minimal with pt, chiropractor. An associated sign and symptom is [n]one. MRI of T spine in 2010 showed multi level thoracic disc disease with cord compression at multiple levels. Has been to POA, then to MUSC and seen by neurosurgery and told it was nonsurgical .[C]ontinues to see pain mgt. Has had trigger point injections, facet injections, and esi with minimal changes improvement in pain. Has been to PT and chiropractor as well with minimal changes in her pain.

(Tr. 857). Examination showed thoracic tenderness, pain with forward flexing and lateral side bending. (Tr. 859). Assessment was "low back pain, stable." (Tr. 859). Plan was:

at this point after 3 years of treatment consisting of ortho evals, neurosurgical evals, pain mgt evals, numerous injections, physical therapy and chiropractic care I think it's unlikely that her pain will improve much, if any, in the future. Further, I think her claim for disability is well founded as she is inoperable and is unable to function independently on her current medications.

(Tr. 859).

On September 11, 2013, Dr. Melba completed a work capacity and pain rating form. (Tr. 801, 1799). He indicated Plaintiff's pain level was moderately severe to severe and would interfere with: the ability to maintain concentration throughout a workday, stay on task for two consecutive hours, and the completion of a workday. (Tr. 801). Plaintiff could sit a total of two hours of a workday and stand for thirty minutes total and could not walk. (Tr. 802). From a choice of four statements, the statement "Pain is profound and intractable; it virtually incapacitates this individual" was selected. (Tr. 803). From a choice of four statements to answer the question to what extent physical activity increased pain, the statement "increase of pain to such a degree as to require increased medication for pain or substantial amounts of bed rest" was selected. (Tr. 803). "Significant side effects can be expected to limit the effectiveness of work duties or the performance of every day tasks as driving an automobile etc." was selected. To the question of what extent

Plaintiff's pain and medication affects ability to work, "Patient will be totally restricted and thus unable to function at a productive level of work" was selected. (Tr. 804). Under the long term prospects of recovery, "although the level of pain may be less intense or less frequent in the future, it will still remain a significant element in this individual's life" was selected. (Tr. 804). The only written comment by Dr. Melba was Plaintiff is unable to drive due to pain medication. (Tr. 804, 1802)

On September 24, 2013, Plaintiff was seen by Dr. Keith Schiff, M.D., of Interventional Pain Management Associates, referred by Dr. Melba. (Tr. 774). It is noted Plaintiff was looking for a new pain clinic due to "inoperable multiple thoracic herniation causing constant pain and limiting activity." "Local and MUSC spine surgeons agree[] spinal injuries inoperable." Plaintiff stopped seeing Dr. Thiyaga due to a poor physician-patient relationship. (Tr. 775). "MRI of the thoracic spine dated, November 15, 201[0], demonstrates disc herniations right paracentral at T6-T7, T7-T8, T8-T9, and T9-T10. Right paracentral T10-T11 and T11-T12 disc herniations. Migrated fragments extend inferiorly from the T7-T8 and T8-T9 disc levels and superiorly from the T9-T10 disc. Cord compressive effects result at T6-T7, T7-T8, T8-T9, T9-T10, T10-11, and T12." (Tr. 777, 781-82). Plaintiff was diagnosed with thoracic intra vertebral disc disease, lumbago, cervicalgia, shoulder and knee pain, and muscle spasms. Dr. Schiff noted the major component of discomfort was muscle spasms. Plaintiff's medication was increased. (Tr. 777).

On October 9, 2013, Plaintiff was seen by Dr. Schiff. (Tr. 772). She reported a current pain level of 4. Neurontin was increased and other medications refilled. (Tr. 773).

On October 9, 2013, Plaintiff was seen by Dr. Thiyaga. (Tr. 1247). Plaintiff was informed the doctor was unable to continue to be her specialist because of the frequent cancellation of

scheduled appointments.

On October 29, 2013, Plaintiff was seen by Dr. Schiff. (Tr. 770). Plaintiff complained of back, knee, and shoulder pain. Plaintiff had significant stressors also affecting her pain level. Plaintiff's medications were continued, and she was advised to avoid prolonged bed rest. (Tr. 771)

On November 19, 2013, Plaintiff was first seen by Dr. Tsoulfas, of Advanced Pain Management in Wisconsin, with complaints of back pain beginning in June 2010 after a vehicle accident. (Tr. 763). She was tender over her spine. (Tr. 765). Plaintiff's Oswestry score was a 40 indicating severe functional impairment. (Tr. 765). Plaintiff was encouraged to use a lumbar brace. (Tr. 766).

On November 26, 2013, Plaintiff was seen by Dr. Tsoulfas and diagnosed with low back pain, lumbar spondylosis without myelopathy, and displacement, lumbar disc without myelopathy. (Tr. 760). Plaintiff reported a current pain level of 6 and at its worst, a level of 10. A diagnostic facet joint block procedure was performed. (Tr. 761).

On December 3, 2013, Plaintiff was seen by Dr. Tsoulfas. (Tr. 757). Plaintiff reported a current pain level of 5. Plaintiff had a comparative anesthetic block performed. (Tr. 758).

On December 17, 2013, Plaintiff was seen by Dr. Tsoulfas. (Tr. 754). Plaintiff reported a current pain level of 4, and therapeutic radiofrequency medial branch neurolysis was performed. (Tr. 755). Plaintiff was "functionally impaired as measured by Oswestry and there is limitation of activities due to the pain."

**2014**

On January 21, 2014, Plaintiff was seen by N.P. Jill Pocius, collaborating with Dr. Tsoulfas, M.D. (Tr. 751). Plaintiff reported stabbing, tingling, and numbness with low back pain at a level

of 4. Her pain interfered with her daily activities. She received 10% relief since the last visit. Her shoulder was tender. (Tr. 752). Assessment was "thoracic MRI report: disc bulging T6-7, T8-9, T9-10, T10-11, and T11-12, there are cord compressive effects at these levels." (Tr. 752). Plaintiff thought her shoulder pain was a result of putting pressure on her cane on the left side.

On January 29, 2014, Plaintiff was seen by Dr. Pavlatos, M.D., of Illinois Bone and Joint Institute with complaints of knee pain. An MRI was scheduled. (Tr. 793, 795). On February 19, 2014, Plaintiff was seen by Dr. Pavlatos, with complaints of knee and shoulder pain. She received injections. (Tr. 790). April 2014 notes from Dr. Clark indicate Plaintiff was to taper narcotic pain medication. (Tr. 811). On May 6, 2014, Plaintiff was seen by Dr. Pavlatos with complaints of shoulder pain. (Tr. 788). She received an injection.

On July 30, 2014, Plaintiff was seen by Dr. Melba with scalp sores and shortness of breath. (Tr. 1788). Under review of systems, it is noted back pain remains a constant issue and had ablation in Illinois in December 2013. (Tr. 1789). Exam was normal except for scalp. (Tr. 1789).

An August 2014 letter from Plaintiff's church stated Plaintiff was disabled. (Tr. 1216).

A lay statement dated September 2014 noted the witness had driven Plaintiff's car to Illinois in November 2013 because Plaintiff was in very poor health, unable to walk, and started to fall. The same witness drove Plaintiff back for her hearing in July 2014. (Tr. 1209).

On August 11, 2014, Plaintiff was seen for itching related to allergies. (Tr. 1785). Exam was normal. (Tr. 1786).

On September 3, 2014, Plaintiff was seen by Dr. Tolan of Steadman Hawkins-Greenville. (Tr. 1304). Plaintiff complained of left shoulder pain from overuse. Pain level was 5 and not satisfactorily controlled. Plaintiff thought the pain was from extended use of a cane on her left side.

Plaintiff had temporary results from injections and therapy. Plaintiff denied any loss of motion or strength in the shoulder. (Tr. 1304). X-rays showed mild degenerative joint disease. Tendons were normal appearing. AC joint on ultrasound showed only minimal degenerative changes. (Tr. 1305). Plaintiff was tender to palpation over biceps tendon. Plaintiff had positive Neer's and O'Brien's. Plaintiff had pain with resisted external rotation but strength was 5/5. Plaintiff was neurovascularly intact. Plaintiff did not want an injection this time. Plaintiff was apprehensive about physical therapy. MRI was ordered. Ice, rest, and ibuprofen was recommended for pain relief. (Tr. 1305).

On September 8, 2014, MRI showed mild subdeltoid bursitis, mild supraspinatus tendinopathy, minimal fraying of labrum without detachment, some mild thickening of the axillary recess capsule and synovia tissue nonspecific no definitive rotator interval inflammatory change to diagnose adhesive capsulitis although this remains a consideration." (Tr. 1824).

On September 12, 2014, Plaintiff was seen by Dr. Tolan. (Tr. 1307). Plaintiff reported shoulder was worse. Pain level was 7. MRI showed supraspinatus tendinopathy but no tear of tendon. MRI also showed bursitis. (Tr. 1307). Plaintiff had 4/5 strength in the supraspinatus and mild tenderness to AC joint and biceps tendon. Plaintiff had negative O'Brien's and positive impingement signs. (Tr. 1308). Plaintiff wanted to continue with conservative treatment. Plaintiff received an injection and exercise bands. Plaintiff could consider surgery later in time. (Tr. 1308).

On November 4, 2014, Plaintiff was seen by Dr. Melba. Plaintiff reported foot tingling. Plaintiff denied back pain. (Tr. 1779). Plaintiff was continuing with pain management and had ablations. (Tr. 1780). Exam was normal. (Tr. 1780). Dr. Melba stated "has a multitude of reasons to have numbness, see prior MRI," "will get NCS first and then decide on repeating MRI." (Tr. 1781).

On November 18, 2014, Plaintiff was seen by Dr. Melba. (Tr. 1776). Plaintiff had tingling in her left foot that began a few months prior and caused trouble with balance. Plaintiff denied back pain. (Tr. 1776). Exam was normal. (Tr. 1777). Plaintiff was to have study done for tingling. (Tr. 1778).

## Records after DLI

### 2015

On May 29, 2015, Plaintiff was seen for feet swelling beginning two day prior with moderate severity. Plaintiff reported back, neck, and knee pain. (Tr. 1772). Upon exam, Plaintiff had no tenderness with normal range of motion of hip/pelvic area, the same for knee. Plaintiff had trace edema on calf. (Tr. 1774).

On June 5, 2015, Plaintiff was seen by Dr. Melba for edema which began three weeks prior. (Tr. 1769). Exam was normal. (Tr. 1770). Medications were refilled.

On June 24, 2015, Plaintiff was seen by Dr. Melba for flank pain that was aggravated by eating and with urinary frequency and nausea. (Tr. 1765). Upon exam, Plaintiff's abdomen had flank tenderness. (Tr. 1767). Plaintiff fainted and was sent to ER with expectation of IV fluids and abdominal CT. (Tr. 1768).

On July 1, 2015, Plaintiff was seen by Dr. Melba for swelling in feet and bloating all over which began a month prior. (Tr. 1762).

On August 21, 2015, Plaintiff was seen by Dr. Melba for lower back pain radiating into hips at times. Plaintiff was followed by pain management and a spinal cord simulator was in the plans of other providers. (Tr. 1749). Upon exam, Plaintiff had persistent thoracic and lumbar tenderness and loss of range of motion. Plaintiff presented to have disability forms filled out. (Tr. 1751-52). "In

the future, she needs to have pain management fill these out as they are now managing her back pain. (Tr. 1752).

On September 9, 2015, lumbar MRI impression was motion degraded exam and mild degenerative changes in the lower lumbar spine without substantial canal or foraminal stenosis at any level. (Tr. 1314). Thoracic spine MRI impression was multilevel disc extrusions in the mid to lower thoracic spine that variably contour the ventral margin of the spinal cord without abnormal cord signal. No substantial foraminal stenosis. (Tr. 1315).

On October 21, 2015, Plaintiff was seen by Dr. Melba for nausea and vomiting. (Tr. 1734). Exam was normal. (Tr. 1736).

On October 23, 2015, Plaintiff was seen by Dr. Melba for lower back pain after an injection. (Tr. 1721). Plaintiff ran out of pain medication and was given enough until she could see pain management. (Tr. 1721). Upon exam, Plaintiff had normal range of motion and right sided lumbar tenderness. (Tr. 1723).

On November 25, 2015, lumbar spine MRI showed evidence of disc protrusion at T11-T12 level not fully assessed on this exam which appears to be causing some attenuation of the ventral subarachnoid space; if clinically indicated, dedicated MRI of thoracic may be helpful. (Tr. 1312). There was broad-based disc bulge at L5-S1 that appears mildly compressive; no severe central canal stenosis noted. (Tr. 1312).

On December 2, 2015, Plaintiff was seen by Dr. Melba for nausea and hypertension. (Tr. 1708). Exam was normal. (Tr. 1710).

**2016**

Plaintiff's pastor noted Plaintiff was unable to pick up anything heavier than 4-5 pounds in

early 2016. (Tr. 1211).

On February 10, 2016, Plaintiff was seen by Dr. Schiff. Plaintiff complained of lower back and neck pain. Plaintiff's left L5 injection pain had improved significantly since October and was nearly resolved. Plaintiff continued to endorse whole body discomfort. (Tr. 1353).

On March 9, 2016, Plaintiff was seen by Dr. Schiff. Plaintiff complained of lower back and middle back pain. Plaintiff saw benefit from Lyrica and wanted an increase. Plaintiff felt her low back pain returned from her facet arthropathy and was interested in the ablations she received in the fall of 2014. Plaintiff felt the ablations lasted up to a year. (Tr. 1346).

On April 6, 2016, Plaintiff was seen by Dr. Schiff. Plaintiff was using Percocet four times a day and had issues with sleeping due to waking from pain and wanted an extended release medication. (Tr. 1339). Upon exam, reflexes were intact and positive facet loading lumbar spine. (Tr. 1341). OxyContin was prescribed for night. (Tr. 1342).

On May 3 ,2016, Plaintiff was seen by Dr. Schiff. (Tr. 1332). Plaintiff complained of pain in the middle and lower back and tingling in left leg. Plaintiff felt she was doing well after left sided ablation and did not want right sided ablations at this time. Plaintiff was taking Lyrica for neuropathic pain, Robaxin for muscle spasms. Percocet, and OxyContin. Plaintiff used a TENS unit. Upon exam, Plaintiff had intact reflexes and decreased facet loading lumbar spine. (Tr. 1334).

On May 4, 2016, Plaintiff was seen by Dr. Melba for swelling. (Tr. 1677). Upon exam, Plaintiff had 1 plus edema to mid shin. (Tr. 1680). Hydrodiuril was prescribed. (Tr. 1681).

On June 28, 2016, Plaintiff was seen by Dr. Mitchell of Carolina Orthopaedic Neurosurgical Associates. (Tr. 1467). "She has had some extruded disc fragments in her thoracic spine and mainly complains of pain over the left SI joint. She has been treated by the pain management doctors now

for the past six years and she has had medial branch blocks, ablations, physical therapy, and she is on chronic pain meds." Plaintiff had insurance. Plaintiff was intact neurologically. (Tr. 1467). Plaintiff had normal gait. (Tr. 1469). Plan was suggested that pain management do an SI joint injection. The thoracic spine MRI was not good quality. Spine surgeons had not been able to help her. "I did not see anything on the MRI reports that make me thing that she is an operative case. She may need to be reworked up from the thoracic down to the lumbar again, if she continues to have this pain, and if she does not respond to this SI joint injection." (Tr. 1469-70).

On June 29, 2016, Plaintiff was seen by Dr. Schiff. (Tr. 1325). Plaintiff had left sided medial branch ablations at L4-S1 in April with improvement in back pain. Plaintiff wanted to change from baclofen to Zanaflex for spasms due to nausea. Plaintiff used OxyContin at night and Percocet as needed during the day. "She is using less of the OxyContin now she is being more active and she feels these exercises are helping." (Tr. 1325). Upon exam, Plaintiff had intact reflexes, decreased sensation in L4 distribution in left lower extremity, positive Faber maneuver on the left side, and positive facet loading lumbar spine. (Tr. 1327). Plaintiff was scheduled for injection due to positive Faber and having tried conservative therapy for six weeks with no relief. Plaintiff completed physical therapy. (Tr. 1328).

On June 30, 2016, Plaintiff was seen by Dr. Lim. Plaintiff was a new patient for low back pain. (Tr. 1463). Plaintiff reported that Dr. Mitchell told her that pain was coming from her SI joint. Plaintiff complained of radiating pain down her left leg and a spot on the left side of her lower back that gives her a lot of pain. Ablations and injections temporarily helped her pain. Plaintiff has had this pain since 2010. Plaintiff complained of numbness and tingling in all her hands and an increased loss of balance. Plaintiff reported pain level of 8. (Tr. 1463). Upon exam, Plaintiff had

normal heel to toe gait and was able to perform all types of walking without difficulty. Plaintiff was not tender over lumbar spinous processes. Plaintiff was tender to palpation over her left SI joint. Plaintiff had negative clonus. Plaintiff had appropriate reflexes and 5/5 strength. Plaintiff had positive Hoffmann's in left hand. (Tr. 1465). X-rays and imaging were reviewed. (Tr. 1465).

On August 3, 2016, Plaintiff was seen by Dr. Schiff of Interventional Pain Management Associates. (Tr. 1318). Plaintiff reported her last sacroiliac joint injection improved a significant amount of her low back and buttock pain. She was to meet with her surgeon about options. (Tr. 1318). Plaintiff was maintained on Percocet 10 mg up to three times a day as needed for breakthrough discomfort. Plaintiff continued Zanaflex for muscle spasms. Plaintiff weaned off Lyrica and reported feeling better off of it. Plaintiff had a pain level of 6. She stated "she is functional and happy on this current regimen." (Tr. 1318). There was no back exam noted. (Tr. 1319). "She does have increased functionality on these medications." (Tr. 1320). Plaintiff was to be as active as possible and continue home exercise regimen. (Tr. 1320).

On August 11, 2016, Plaintiff was seen by Dr. Lim. Plaintiff reported prior injections gave 100% improvement but only lasted a day. Plaintiff reported pain level of 6. (Tr. 1459). Upon exam, Plaintiff had intact sensation and 5/5 strength. Plaintiff was "tender to palpation over the pelvic crest as well as the thigh" and "positive Faber's with the left leg." An MRI reviewed had shown arthritic changes in the left SI joint. Plan was for a CT. (Tr. 1461). CT showed minimal tiny, single subchondral cyst seen at the left sacroiliac joint and otherwise normal pelvis and hips. (Tr. 1796).

On August 15, 2016, Plaintiff was seen by Dr. Lim. Plaintiff reported severe pain over the left SI joint and not getting better. Plaintiff's prior injections gave great relief but only lasted 1-2 weeks. (Tr. 1455). Upon exam, Plaintiff had normal gait, intact sensation, 5/5 strength, and "pain

with compression of the pelvic crest, as well as thigh thrust and FABER test." (Tr. 1457). CT showed air in the joint on the left, cystic changes in the left SI joint suggesting arthritic changes. (Tr. 1457). Plaintiff agreed to surgery.

On August 15, 2016, Plaintiff was seen by Dr. Melba. (Tr. 1662). Exam was normal.

On September 7, 2016, Plaintiff was seen by Dr. Melba. (Tr. 1642). Plaintiff was being followed by Dr. Schiff for pain management. Upon exam, Plaintiff appeared to be in discomfort and ambulated with a cane. Percocet was refilled and a referral for pain management was given. (Tr. 1644).

On October 10, 2016, Plaintiff was seen by Dr. Melba. (Tr. 1629).  Plaintiff had been planning on surgery but changed her mind and was going to Duke for a second opinion. (Tr. 1630). Upon exam, Plaintiff appeared to be in discomfort and ambulated with a cane. Plaintiff was prescribed Percocet, Zanaflex, and Restoril. (Tr. 1631).

On October 12, 2016, Plaintiff was seen at the Duke Spine Center by orthopedic surgeon Dr. Erickson. (Tr. 1407).  Plaintiff complained of severe worsening pain. (Tr. 1410). Gait was normal. (Tr. 1412). Rang of motion was normal/painless in all categories of lumbar and cervical. (Tr. 1412). Plaintiff was nontender. Plaintiff had 5/5 strength in all categories and normal sensory. Plaintiff had normal reflexes; Hoffman and Clonus were absent. (Tr. 1413-14).  MRIs were reviewed and it was noted Plaintiff did have thoracic disc herniations at T6-10 with some migrated fragments and no evidence of cord signal or defamation of the cord at these levels. Cervical showed degenerative changes most prominent at C5-6. (Tr. 1414). Plaintiff was referred for nerve studies to determine definitive origin of symptoms. (Tr. 1415).

On November 1, 2016, Plaintiff was seen at DukeHealth with diagnosis of SI pain and

lumbar degenerative disc disease. (Tr. 1392). Plaintiff was seen by Dr. Liu. (Tr. 1395). Plaintiff reported chronic left lower back for years after injury. Plaintiff had tried injections, ablation, traction, and physical therapy. Plaintiff reported 75% of her pain was in the left lower back and 25% in left leg and right lower back. Plaintiff reported pain level of 9. (Tr. 1395). Plaintiff reported the pain was aggravated with activity such as walking/standing/sitting and was better lying down. (Tr. 1395). Plaintiff was asking whether she should have an SI fusion. Gait was normal. (Tr. 1397). Plaintiff had pain worse with extension of lumbar. (Tr. 1397). Plaintiff had tenderness to palpation of paraspinal. Plaintiff had normal reflexes and sensation. (Tr. 1398). MRI reviewed showed L5-S1 bulge with annular tear. (Tr. 1398).

On November 7, 2016, Plaintiff was seen by Dr. Melba. (Tr. 1611). It is noted Plaintiff had left lower back pain resulting from an injury six years prior and exacerbated by a fall in 2015. (Tr. 1611). Plaintiff described the severity as debilitating and cannot perform many activities of daily living (cooking and cleaning). Plaintiff was planning further injections at Duke. Plaintiff still had not seen pain management. (Tr. 1612). Upon exam, Plaintiff appeared to be in discomfort and ambulated with a cane. (Tr. 1613).

On November 18, 2016, Plaintiff was seen at DukeHealth with diagnosis of pain and spondylosis of lumbar region without myelopathy or radiculopathy and SI pain. (Tr. 1362, 1366). Plaintiff had left L5-S2 medial branch block performed. (Tr. 1371).

On December 22, 2016, Plaintiff was seen by Dr. Lim. Plaintiff continued to have pain over the SI joint on her left side progressively worsening. Prior injections gave great relief but only for a short time. Plaintiff denied any radicular symptoms down her legs. (Tr. 1451). Upon exam, Plaintiff had "pain with compression of the pelvic crest, as well as thigh thrust and FABER test."

(Tr. 1453). Plaintiff was offered surgery due to air within her joint and past significant relief with prior left SI joint injections. Plaintiff had failed all conservative treatments. (Tr. 1453).

On December 22 and 29, 2016, Plaintiff was seen by Dr. Melba for surgical clearance. (Tr. 1555, 1597). Exam was normal. (Tr. 1557, 1600).

**2017**

On January 6, 2017, Plaintiff had left SI joint fusion with bone morphogenetic proteins and allograft DBM. (Tr. 1449). Plaintiff had failed conservative measures of injections, medication, activity modification, and physical therapy. (Tr. 1449).

On January 19, 2017, Plaintiff was seen by Dr. Lim. Plaintiff stated her SI joint pain had improved since surgery. (Tr. 1445). Upon exam, Plaintiff had intact sensation, 5/5 strength, and was neurovascularly intact. Plaintiff was to "continue with all her normal activities." (Tr. 1447).

On February 16, 2017, Plaintiff was seen by Dr. Lim. Plaintiff was six weeks post surgery was doing much better with usual pain level around 3 but long drive brought it to 5. (Tr. 1441). Upon exam, Plaintiff had normal gait and was neurologically stable with no changes. Plaintiff was doing well with no restrictions. (Tr. 1443).

On February 16, 2017, Plaintiff was seen by Dr. Melba. (Tr. 1539). Exam was normal. Medications were refilled. (Tr. 1541).

On April 13 2017, Plaintiff was seen by Dr. Lim. Plaintiff reported her left leg pain improved and that she was "back to doing activities that she was not able to prior to surgery. She is extremely happy that she has had this surgery done, and she feels like she is improving on a daily basis." (Tr. 1437). Upon exam, Plaintiff had 5/5 strength, decreased sensation over the lateral side of left thigh and dorsal side of left foot. Plaintiff was neurovascularly intact. (Tr. 1439). Plaintiff had normal gait.

"The plan at this time is for [Plaintiff] to continue with all of her normal activities." (Tr. 1439).

On April 13, 2017, Plaintiff was seen by Dr. Melba. (Tr. 1524). Pain medications were being tapered. (Tr. 1525). Exam was normal with no back category or musculoskeletal. (Tr. 1526). Plaintiff had edema, which was suspected to be from inactivity due to back pain and possible steroids from injection. (Tr. 1527).

On May 10, 2017, Plaintiff was seen by Dr. Melba. (Tr. 1509). Plaintiff needed injections and referral to pain management. (Tr. 1513). Lower back pain had been improving but now was worsening. (Tr. 1515). There is no exam as to back. (Tr. 1517). Exams generally state well-nourished, normal heart rate, normal breath sounds, and normal bowel sounds without anything more. (Tr. 1517).

On June 5, 2017, Plaintiff was seen by Dr. Kline of Atlantic Coast Pain Specialist. (Tr. 1852). Plaintiff reported pain level of 8 with primary complaint in low back pain and has had such pain since 2010. "She [ha]s undergone epidural injections in the past which provided transient relief." Plaintiff had ablation on right said with almost 4 years of relief and on right side with 7 months of relief. Plaintiff noted the relief was greater than 80% pain reduction. (Tr. 1852). Upon exam, Plaintiff was in mild to moderate distress; range of motion of lumbar was restricted with extension due to pain and lateral bending due to pain. Plaintiff had normal flexion and no tenderness over lumbar spine. Plaintiff had tenderness on both sides of paravertebral muscles. Reflexes were normal. (Tr. 1854-55). Plan was authorization for repeat lumbar radiofrequency ablation at the lower lumbar levels with no need to repeat medial branch nerve blocks. (Tr. 1855).

On July 27, 2017, Plaintiff was seen by Dr. Lim. Plaintiff was doing well. Her pain was much improved since surgery especially over the SI region but she still had some left leg pain. (Tr. 1432).

Upon exam, Plaintiff was neurologically stable with 5/5 strength. (Tr. 1434).

On September 8, 2017, Plaintiff was seen by Dr. Melba. Plaintiff had left lower back pain radiating into the left thigh, which began years ago. It was improving after SI joint fusion. Percocet was being tapered. (Tr. 1479; 1758). There was no back exam. (Tr. 1484).

On September 22, 2017, Plaintiff was seen by Dr. Kline. Plaintiff continued with low back pain and was managed by another provider with NSAID and opioids. Plaintiff reported physical therapy helped minimally. "She states that this pain is affecting her daily function in her ability to earn a living." (Tr. 1856). Dr. Kline was going to take over pain management medications. Plaintiff had five ablations in the past each with good relief and success. (Tr. 1858). Because Plaintiff had done exercise, PT, and medical management without relief, Dr. Kline believed "she has successfuly fulfilled all her insurance requirements to undergo a repeat lumbar radiofrequency ablation at L3-S1. (Tr. 1859).

On October 2, 2017, Plaintiff was seen by Dr. Kline. Plaintiff reported pain level of 9. (Tr. 1860). Plaintiff received ablation procedure. (Tr. 1862). On October 16, 2017, Plaintiff received another ablation procedure on the right. (Tr. 1864).

On November 7, 2017, Plaintiff was seen by Dr. Kline. Plaintiff reported pain of 7. Plaintiff reported her back pain was gone but she had discomfort in her left leg. Plaintiff reported she was off Lyrica because it caused her to retain sodium. Plaintiff wears a thoracic brace and an SI brace. (Tr. 1869). Upon exam of thoracic, range of motion was limited due to pain. Paravertebral muscles were normal. Lumbar spine had no limitation in range of motion. (Tr. 1872). Percocet was changed to Oxycodone. Physical therapy was to start. (Tr. 1872).

On December 5, 2017, Plaintiff was seen by Dr. Kline. Plaintiff wanted an epidural injection

to help with the radiating pain that started to cause more debilitation, as she started to use a cane to walk. (Tr. 1874). Upon exam, thoracic had restricted range of motion and bending due to pain. Lumbar was normal. (Tr. 1876). Pain medications were refilled; "her pain medicine is the only thing that allows her to function as normally as possible." (Tr. 1877).

On December 12, 2017, Plaintiff was seen by Dr. Kline for lumbar epidural injection at L5-S1. (Tr. 1878).

**2018**

A letter dated February 2018 from a church noted Plaintiff lived with the lay witness from July 2014 to September 2014 and was observed to be in considerable pain at all times with very limited mobility. (Tr. 1207).

A letter dated March 2018 from Plaintiff's friend, who has only known her since January 2016, stated Plaintiff had to stop frequently to drive herself and he did chores for her because she was unable. Plaintiff constantly rotates between sitting, standing, and lying down. Plaintiff is frequently in pain. (Tr. 1225). Plaintiff was never seen walking unaided. (Tr. 1226).

On January 2, 2018, Plaintiff was seen by Dr. Kline. Plaintiff reported 65% relief for ten days after injection and wanted a disability evaluation. Plaintiff reported her back pain keeps her from cooking anything more complicated than toast and she does not live a normal life due to her back pain. Plaintiff reported the pain is sometimes in her lower back, legs, mid back, and shoulder. (Tr. 1882). Plaintiff reported multiple surgeons refused to operate because of the extensive problems. Plaintiff wanted to consider a simulator trial again and a repeat injection. (Tr. 1882). Upon exam, Plaintiff had grimacing face, guarded and stiff movement, and frequent position changes. (Tr. 1884). Plaintiff had tenderness of paravertebral thoracic muscles. (Tr. 1885). Range of motion of lumbar

was restricted with extension and bending due to pain. Lumbar paravertebral muscles had tenderness and spasm. (Tr. 1885). Hip was normal with negative Faber. (Tr. 1885). Plaintiff was referred for possible simulator trial. Gabapentin was increased. (Tr. 1885).

On January 11, 2018, Plaintiff was seen by Dr. Lim of Carolina Orthopaedic and Neurosurgical Associates. (Tr. 1428). Plaintiff reported her SI joint pain was better. Plaintiff had a SI joint fusion surgery nearly a year earlier. Plaintiff reported having pain down the posterior side of her right leg. Dr. Kline, pain management, suggested a possible spinal cord simulator trial. Plaintiff reported her quality of life has decreased and she is unable to do normal activities of daily living. Plaintiff denied low back pain and reported it began in her buttock. (Tr. 1428). Plaintiff reported a pain level of 8. (Tr. 1428). Upon exam, Plaintiff had antalgic gait with cane use. Plaintiff had 5/5 strength. X-ray showed stable SI fusion. Plaintiff was to get a lumbar MRI and EMG. (Tr. 1430-31).

On January 16, 2018, Plaintiff was seen by Dr. Kline. Plaintiff received lumbar injection. (Tr. 1889). On January 22, 2018, Plaintiff reported pain level of 7 and reported only two days of relief then the pain worsened. Plaintiff was scheduled for an EMG and MRI. (Tr. 1893). Exam was similar to early January exam. (Tr. 1895). Plaintiff was to be referred to Select Health for a functional capacity evaluation. (Tr. 1896). On January 25, 2018, Plaintiff was evaluated by mental health for a spinal cord stimulator. (Tr. 1897). There were no acute or inadequately managed mental illnesses that would interfere with trial and was a candidate emotionally prepared to undergo the procedure. (Tr. 1898).

On February 12, 2018, Plaintiff was seen by Dr. Kline for spinal cord stimulator trial. (Tr. 1899). On February 15, it was reprogrammed. Plaintiff reported pain level of 6 and felt like she

pulled leads. Plaintiff reported 35% relief. (Tr. 1903).

On February 19, 2018, Plaintiff was seen by Dr. Kline for removal of spinal cord simulator leads. Plaintiff reported she had 60% relief during trial and was able to walk 110 yards further than before. "She does still have limited function, as she is still unable to tolerate sitting or standing for long periods of time without having to change positions frequently. (Tr. 1472).

On March 13, 2018, Dr. Melba completed a "Medical Source Statement of Ability to do Work-Related Activities." (Tr. 1912). Plaintiff could never lift or carry up to 10 pounds. (Tr. 1912). For the question identify findings that support such limitations and why the findings support such, there was no answer. (Tr. 1912). Plaintiff could sit 2 hours, stand 1 hour, and walk 1 hour in a work day. Due to back pain, Plaintiff was unable to work more than 30 minutes to one hour. (Tr. 1913). Plaintiff required a cane and could walk 50 yards without a cane. For the question "identify the findings for the above limitations," it states abnormal MRI 2015. (Tr. 1913). Plaintiff could occasionally for all hand activities, except never push/pull. (Tr. 1914). No findings were identified for such limitations. Plaintiff could occasionally operate foot controls; no findings were identified for such limitations. (Tr. 1914). Plaintiff could never on all postural activities with no findings identified for such limitations. (Tr. 1915). Plaintiff could occasionally operate a motor vehicle. Plaintiff could frequently have exposure to dust, odors, fumes, and pulmonary irritants. Plaintiff could never be exposed to unprotected heights, moving mechanical parts, humidity and wetness, extreme cold/heat, and vibrations. (Tr. 1916). No findings were identified for such limitations. Plaintiff could not shop, travel without a companion, walk a block at a reasonable pace on rough or uneven surfaces, or use public transportation. Plaintiff could climb a few steps, prepare a simple meal for self, care for hygiene, and sort, handle, and use papers/files. (Tr. 1917). Findings for such

was due to back pain/leg numbness, she is unable to complete most activities of daily living. "The limitations above are assumed to be your opinion regarding current limitations only. However, if you have sufficient information to form an opinion within a reasonable degree of medical probability as to past limitations on what date were the limitation you found above first present;" this was not answered. (Tr. 1917). Dr. Melba answered "yes" as to if limitations lasted or will last for 12 consecutive months. (Tr. 1917).

## C.    The Administrative Proceedings

### 1.    The Administrative Hearing

#### a.    Plaintiff's Testimony

On July 28, 2014, Plaintiff appeared with her attorney at a hearing before ALJ Colin Fritz. Dr. Robert Brabham testified as an impartial vocational expert (VE). (Tr. 37).

Plaintiff testified she was currently living in Wisconsin. (Tr. 42). Plaintiff confirmed her alleged onset date of July 12, 2011. (Tr. 43). Plaintiff had worked as a software engineer for about fourteen years. (Tr. 43-44). Plaintiff was laid off on January 15, 2009. (Tr. 45). Then, Plaintiff found temporary work with DHEC on a H1N1 strike team helping with flu shot administration until February 2010. (Tr. 45-46). Plaintiff had an automobile accident in 2010. (Tr. 47-48). After, Plaintiff continued to look for work and received unemployment benefits until April 2012. (Tr. 46-47). In 2011, Plaintiff started having gastrointestinal problems and loss of bladder and bowel control. (Tr. 48). Plaintiff was diagnosed with IBS and lactose intolerance. (Tr. 48). Plaintiff testified that she stopped looking for work when the second surgeon said there was no way to fix the problem in the middle of her thoracic spine and that date was around when she filed for disability. (Tr. 49-51).

Plaintiff testified that she suffered from: several herniated and bulging discs in her thoracic, cervical, and lumbar spine, impediments on her spinal cord, osteoarthritis, impingement in her shoulder, possible rotator cuff tear, IBS, a staph infection, carpal tunnel syndrome, ganglion cysts, migraines, anxiety, depression, and high blood pressure. (Tr. 51-53). Plaintiff used to volunteer, garden, and ride her bike, but now the physical limitations, pain, and depression cause her to have no desire to go out. (Tr. 56).

Plaintiff's back problems are both from degeneration and the automobile accident. (Tr. 57). Plaintiff testified that not only are her discs out of place, but the pain is worse. It is painful to sleep or sit. (Tr. 57). She testified that the pain adds to her depression. (Tr. 57). Plaintiff testified that treatments for her back pain were medication, physical therapy, injections, and moving around. (Tr. 58). Plaintiff can bend halfway and can squat, but cannot get back up. (Tr. 58-59). Plaintiff cannot kneel. Plaintiff can lift a light bag of groceries. (Tr. 59). Plaintiff can sit for thirty minutes without a break. (Tr. 61). Plaintiff has two or three migraines a month. (Tr. 61-62). Plaintiff has medication for migraines but it has limitations on how much and how often she can take it. (Tr. 62). She has trouble walking and trouble with stairs. (Tr. 62). Plaintiff has problems balancing and falls to the left. (Tr. 63). Plaintiff cannot drive much because of her pain and her medication. (Tr. 64). Plaintiff sleeps four hours a night using muscle relaxers and naps during the day. (Tr. 65-66).

Plaintiff uses a TENS unit once a day. (Tr. 67). In the afternoons on a typical day, Plaintiff grocery shops or washes a small load of clothes. Plaintiff can watch a little TV before her eyes hurt. (Tr. 68). Plaintiff can do light cooking. (Tr. 68). Plaintiff used to make soap, but she cannot do that anymore because it takes too long and involves lifting things. (Tr. 69). Plaintiff does not like to be around a lot of people. (Tr. 70). Plaintiff gets herself ready for the day but had to make some

changes in clothes she wears and how she does her hair. (Tr. 70). Plaintiff cannot sit through a movie. (Tr. 71). If Plaintiff goes somewhere one day, she will feel bad for two days afterwards. (Tr. 71). Plaintiff has two good days and three really bad days a week. On the really bad days, she is unable to get out of bed. (Tr. 71).

Plaintiff did not think she could do a job where she sat all day because she could not keep the commitment of being there at a certain day and time if her back is pinched that day. (Tr. 72). Plaintiff's prior job at DHEC was a lot of walking, standing, and lifting. (Tr. 73). Plaintiff's job at Activant was long hours and lots of sitting and lifting. (Tr. 73). Plaintiff believes she was part of her layoff group at Activant because she had been warned that she took too much time off for being ill. (Tr. 73). Plaintiff testified that she did not think she could have a sit/stand option job because she does not know one day from the next if her back is going to keep her in bed. She was fearful she would not make it to the hearing. (Tr. 74). She testified that if she is lacking sleep, she would be messing up any packaging job. (Tr. 74). Plaintiff testified that she would love to work and it is upsetting not to work. (Tr. 75).

Plaintiff testified her shoulder has hooked acromia, impinging on the rotator cuff with a possible tear. (Tr. 76). It probably needs surgery. (Tr. 76). Plaintiff had knee surgery before and now her knee is essentially worn out where the kneecap slides out of the channel. (Tr. 77). She has arthritis and restless leg syndrome. (Tr. 77).

On March 21, 2018, Plaintiff appeared with her attorney at a hearing before ALJ Colin Fritz. William Stewart testified as an impartial vocational expert (VE). (Tr. 922). The ALJ noted that there was a lot of medical evidence submitted after the prior decision that should have been submitted prior to that decision. (Tr. 926). The onset date was amended to near the application date. (Tr. 927).

Plaintiff had received unemployment benefits in 2012. (Tr. 927). Plaintiff's past work was discussed. Plaintiff testified the worst condition for her was back pain in the lower left and center lower back just above the waist in the center. (Tr. 938). Plaintiff testified her symptoms worsened since the last hearing. (Tr. 939). The ALJ corrected the attorney noting Plaintiff had worsened since then but needed to be DLI specific. Between July 2014 and December 2014, Plaintiff testified her lower left side pain worsened where she needed another neuro ablation, she had more steroid injections and an increase in pain medications. (Tr. 940). Plaintiff testified it was more painful to stand, sit, and walk. (Tr. 941). Before December 2014, Plaintiff used a cane, TENS unit, SI belt, and thoracic brace. (Tr. 941). Plaintiff reported between July and December 2014, her attention and depression worsened. (Tr. 941-42). Plaintiff does not drive over half an hour; her friend drives and she rotates positions front and back and lying on pillows. (Tr. 942). Plaintiff reported the pain caused her not to be able to focus. (Tr. 944). Plaintiff reported from July to December 2014 her life was falling apart. (Tr. 945). Plaintiff sometimes drives longer trips with breaks at 30 minutes increments. (Tr. 945-46). Plaintiff reported her later SI joint surgery in January 2017 made her leg worse. (Tr. 949). When asked about a gap of treatment with Dr. Melba between November 2014 and May, Plaintiff testified that she would have only seen Dr. Melba if she was sick for something other than pain and that she was managed by Dr. Schiff for pain management. (Tr. 952). Plaintiff testified her 2011 trip to Scotland was a disaster because her instructors had to pull her up the hills by her cane and she had to lay down a lot because she was not able to keep up. (Tr. 952).

Based on a hypothetical consistent with the RFC found by the ALJ, the VE testified to significant jobs in the national economy.

### 2.    The ALJ's Decision

In the decision of June 25, 2018, the ALJ made the following findings of fact and conclusions of law (Tr. 886-909):

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2014.

2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of August 3, 2012 through her date last insured of December 31, 2014 (20 CFR 404.1571 *et seq*.).

3.    Through the date last insured, the claimant had the following severe impairments: spine disorder, right knee patellofemoral arthritis, left shoulder impingement, and migraine headaches (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that through the date last insured, over the course of an eight-hour workday, in two-hour increments with normal and acceptable work breaks, the claimant could perform work at the light exertional level as defined in 20 CFR 404.1567(b), except that standing and walking combined could be performed for four hours out of an eight-hour workday, and sitting could be performed for six hours out of an eight-hour workday, and bilateral use of foot controls was limited to occasional within the exertional level. She could never climb ladders/ropes/scaffolds and could occasionally climb ramps and stairs, kneel, crouch, and crawl. She could occasionally stoop to lift within the exertional level from the floor to the waist and frequently stoop to lift within the exertional level from waist height and above. She could frequently balance. Dominant left arm overhead reaching could be performed occasionally within the exertional level. Bilateral handling and fingering could be performed frequently within the exertional level. She could constantly be exposed to a very quiet to a moderate noise environment. She could occasionally be exposed to a loud and very loud noise environment. She could occasionally be exposed to hazards associated with unprotected dangerous machinery or unprotected heights. She could concentrate, persist and maintain pace to understand, remember and carry out unskilled, routine tasks, in a low stress work environment (defined as being free of fast-paced or team-dependent production requirements), involving the application of commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. She could deal with problems involving several concrete variables in or from standardized situations. She could adapt to occasional workplace changes.

6.  Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on July 6, 1968 and was 46 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from August 3, 2012, the alleged onset date, through December 31, 2014, the date last insured (20 CFR 404.1520(g)).

## II. DISCUSSION

Plaintiff argues the ALJ erred in his Listing 1.04A analysis. Defendant argues the ALJ explained how Plaintiff did not meet Listing 1.04A because Plaintiff failed to prove all of the criteria prior to Plaintiff's DLI.

Plaintiff argues the ALJ erred in giving only some weight to Dr. Melba's opinions. Defendant argues Dr. Melba's opinion was not entitled to controlling weight because it was inconsistent with the record and inconsistent with his own examination findings.

## A.    LEGAL FRAMEWORK

### 1.    The Commissioner's Determination–of–Disability Process

The Act provides that disability benefits shall be available to those persons insured for

benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as: the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months. 42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting the "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity ("SGA"); (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents him from doing SGA. See 20 C.F.R. § 404.1520. These

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. See 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

## 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [ ] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner

are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases *de novo* or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir.1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## B.    ANALYSIS

### Listing 1.04A

Plaintiff argues the ALJ erred in his Listing 1.04A analysis. Defendant argues the ALJ explained how Plaintiff did not meet Listing 1.04A because Plaintiff failed to prove all of the criteria prior to Plaintiff's DLI.

The "Listings," found at 20 C.F.R. part 404, subpart P, appendix 1, "is a catalog of various disabilities, which are defined by 'specific medical signs, symptoms, or laboratory test results.' " *Bennett v. Sullivan*, 917 F.2d 157, 160 (4th Cir. 1990) (quoting *Sullivan v. Zebley*, 493 U.S. 521,

530, (1990)). A claimant's impairment meets a Listing if "it satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement." 20 C.F.R. § 404.1525(c)(3). When a claimant satisfies a listing by meeting all of its specified medical criteria, she presumably qualifies for benefits. *See Bennett*, 917 F.2d at 160.

The impairment medically equals a Listing "if it is at least equal in severity and duration to the criteria of any listed impairment." *Id.* § 404.1526(a). If a claimant has a listed impairment, but: 1) does "not exhibit one or more of the findings specified in the particular listing, or" 2) exhibits "all of the findings, but one or more of the findings is not as severe as specified in the listing," the claimant's impairment is medically equivalent to the listing if the claimant has "other findings related to [his or her] impairment that are at least of equal medical significance to the required criteria." 20 C.F.R. § 404.1526(b)(1).

To determine whether a claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1, the ALJ must identify the relevant listed impairments and then compare the listing criteria with evidence of claimant's symptoms. *Cook v. Heckler*, 783 F.2d 1168 (4th Cir.1986)(emphasis added). In *Cook v. Heckler*, the court held that the ALJ should "have compared each of the listed criteria to the evidence of [the claimant's] symptoms. Without such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination." *Id.* at 1173.

The ALJ found:

> The impairment does not meet or medically equal Listing 1.02 because the impairment does not result in inability to ambulate effectively, as defined in l.00B2b (1.02A). The impairment also does not result in inability to perform fine and gross movements effectively, as defined in l.00B2c (1.02B). Evidence supporting this conclusion includes exam findings and imaging results discussed below.

The impairment does not meet or medically equal Listing 1.04. **There is no evidence of nerve root compression** (1.04A). According to AR-15-1(4), a claimant need not show that each criteria in listing 1.04A was present at precisely the same time i.e., simultaneously,) in order to establish the chronic nature of his or her condition. Nonetheless, **the claimant's spine impairment does not meet or medically equal Listing 1.04A because one or more of the medical criteria of paragraph A,· i.e., neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) did not appear in the record at all during the period under consideration or it appeared for only discrete periods** (AR 15-1(4)).

There is also no evidence of spinal arachnoiditis as required by listing 1.04B or lumbar spinal stenosis resulting in pseudoclaudication as required by listing l .04C. Exam findings and imaging evidence, discussed below, support this conclusion.

(Tr. 891)(emphasis added).

The Listing regulation version in effect at the time of the ALJ's decision in June 2018, is

effective May 2018 through September 2019. Listing 1.04A provides:

1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.04A (emphasis added).

As to the requirement of a spine disorder that results in compromise of a nerve root or

compromise of the spinal cord, Plaintiff argues a 2010 MRI prior to the 2012 amended alleged onset

date shows spinal cord compression in the thoracic spine and disc herniations in the lumbar spine

with cord compressive effects. (ECF No. 12 at 11-12). Plaintiff argues these findings again were

present on a 2015 CT scan with "cord compromise." Plaintiff argues that Plaintiff's thoracic spine was with compromised nerve roots throughout the relevant period at issue and meets the first requirement. Defendant responds not to the introductory requirement but in regards to the criteria in paragraph A, arguing all of the criteria did not appear in the record during the relevant period or appeared for only discrete periods and that the ALJ discussed the evidence supporting the Listing findings in the body of his decision. (ECF No. 13 at 13-14).

The ALJ noted "thoracic spine MRI [in 2010] revealed disc herniations at T8-12 affecting the cord." (Tr. 893). The record shows on January 21, 2014, Plaintiff was seen by N.P. Jill Pocius, collaborating with Dr. Tsoulfas, M.D. (Tr. 751). Assessment was "thoracic MRI report: disc bulging T6-7, T8-9, T9-10, T10-11, and T11-12, there are **cord compressive effects** at these levels." (Tr. 752)(emphasis added). Assuming without deciding, it appears Plaintiff could meet the introductory requirements of Listing 1.04A of a spine disorder resulting compromise[3] of a nerve root of the spinal cord. Defendant does not present a responsive argument otherwise as to the introductory requirement.

The ALJ found "no evidence of nerve root compression."(Tr. 891). The crux of the disagreement is whether the record supports all of the criteria in A of Listing 1.04 before the DLI:

-neuro-anatomic distribution of pain,

-limitation of motion of the spine,

- motor loss (atrophy with associated muscle weakness or muscle weakness), accompanied by sensory or reflex loss,

---

[3] Compromise is different from compression. Compromise is the introductory requirement and evidence of compression is characterized by the five items in A of Listing 1.04.

- and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.04A.

In this particular case, the court looks at whether there is harmless error in the ALJ's lack of factor by factor analysis of Listing 1.04A because the ALJ did make a finding on Listing 1.04A.

As to neuro-anatomic distribution of pain, Defendant makes no response to arguments regarding this factor. Defendant focuses on findings of no sensory or reflex loss and no positive straight leg raising tests during the period at issue. Plaintiff cites to several records in 2010 and 2011, before the amended onset date, of tenderness upon exams and asserts that this is neuroanatomic distribution of pain. Plaintiff cites to 2013 exams of pain with extension and palpation. (Tr. 757-58). In one case, it was questionable that a person whose examination records showed no tenderness to palpation could show compression characterized by neuro-anatomic distribution of pain. *Gibson v. Astrue*, No. 2:10CV00040, 2011 WL 587170, at *7 (W.D. Va. Feb. 10, 2011). Due to the records of tenderness and case law, it appears Plaintiff could meet this part of Listing 1.04A.

As to the 1.04A factor of limitation of motion of the spine, the record contains evidence indicating normal range of motion and evidence of reduced range of motion. (Tr. 757-58, 596, 894, 1248-72). The record shows that on September 5, 2012, Dr. Thiyaga's exam showed more pain behavior with greater limitation of range of motion; on August 5, 2013, Dr. Thiyaga's exam showed spine extension was limited worse than flexion due to pain and lateral rotation was limited on both sides due to pain. (Tr. 597,1252). There is conflicting evidence as to the factor of limitation of motion of the spine. and With such conflicting evidence and without the ALJ's analysis, the court cannot conduct a meaningful review. *Radford v. Colvin*, 734 F.3d 288, 296 (4th Cir. 2013); *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir.1986).

46

As to motor loss (atrophy with associated muscle weakness or muscle weakness), Plaintiff cites to exams prior to the amended alleged onset date and to Dr. Jain's 2013 notation of 4/5 giveway weakness on left side. (Tr. 826). Defendant cites to the ALJ's notation in the RFC narrative of full strength in August 2012, September 2012, November 2012 through September 2013, August 2013, September 2013, and January 2014. (Tr. 320, 893-94, 596, 1248-72, 862, 895, 777, 752). Again, there is conflicting evidence as to the factor of motor loss. Without the ALJ's analysis, the court cannot conduct a meaningful review.

As to sensory or reflex loss, Plaintiff cites to Dr. Jain's 2013 exam of reduced sensation to temperature on the left and Dr. Schiff's September 2013 exam of diminished sensation to light touch in the L4 nerve distribution. (Tr. 826, 777). Defendant cites to the ALJ's notation in the RFC narrative of normal reflexes and sensation in August 2012, intact sensation and reflexes in September 2012, normal sensation and no pathological reflexes in exams from November 2012 through September 2013, no obvious sensory deficits and normal reflexes in August 2013, and symmetrical reflexes in September 2013, (Tr. 320, 893-94, 596, 1248-72, 895, 777). Without the ALJ's analysis of this Listing factor and such conflicting evidence, the court cannot conduct a meaningful review.

With regard to involvement of the lower back, positive straight-leg raising test (sitting and supine), Plaintiff argues she meets Listing 1.04A through her thoracic impairments and the ALJ provided no reasoning as to the conclusion that not all of the A requirements were met. (ECF No. 12 at 14). The ALJ noted in the opinion as a whole, negative straight leg raising in August 2012, November 2012 through September 2013, and September 24, 2013. (Tr. 320, 893-95, 1248-72, 777). Plaintiff's response argues that straight leg raise testing is not required per the Listing because Plaintiff "suffers from cervical and thoracic impairments, as opposed to lumbar impairments." (ECF

No. 14 at 3). Plaintiff argues the requirement of "if there is involvement of the lower back, positive straight-leg raising test" is inapplicable to Plaintiff. (ECF No. 14 at 3). While the ALJ found a general severe impairment of "spine disorder" without discussion of which area and Plaintiff was treated for spine areas of cervical, thoracic, lumbar, and sacroiliac, the only objective imaging regarding spinal cord compression was in the thoracic, and lumbar MRIs at the same time showed mild multilevel disc desiccation. (Tr. 889, 894). Later, outside of the relevant time period, a lumbar MRI showed a broad-based disc bulge at L5-S1 that appeared mildly compressive. (Tr. 896).

In order to meet Listing 1.04A, if a claimant's particular spine disorder involves the lower back, a claimant must have positive straight leg raising results. If a claimant has involvement of the thoracic or spine location other than lower back, the other factors in Listing 1.04A must be met, not straight leg raising. It is unclear from the ALJ's opinion what spine impairments are analyzed under Listing 1.04A. Without the identity of the particular spine area, the court is unable to properly review the ALJ's analysis of Listing 1.04A.

When "there is at least conflicting evidence in the record" as to whether a Claimant satisfies a listing, the ALJ must explain his determination that Claimant's impairment does not meet or exceed the listing. *Radford v. Colvin,* 734 F.3d 288, 295 (4th Cir. 2013). The ALJ cannot "summarily conclude" that a listing is not satisfied because "insufficient legal analysis makes it impossible for a reviewing court to evaluate whether substantial evidence supports the ALJ's findings." *Id.* In *Radford,* the record showed "limited motion of the spine on at least four occasions, positive straight leg raises at least five times, and sensory reflex loss on at least three occasions," but it also showed "no weakness, sensory loss, or limitation of motion during some examinations." *Id.* at 296. The Court held that there was conflicting evidence requiring a detailed explanation from the ALJ. *Id.*

Like in *Radford*, here there are both normal and abnormal exams, i.e. some of the Listing criteria being met and some not being met at various times. The ALJ did not explain with citation to record evidence what he considered within each Listing 1.04A factor criteria to reach the conclusion that Plaintiff did not meet all of the Listing 1.04A criteria. Where conflicting evidence exists, an explanation is required of the ALJ as to a Listing analysis. *Id.* at 296. This issue merits remand.

**Dr. Melba's 2013 Opinions**

Plaintiff argues the ALJ erred in giving only some weight to Dr. Melba's opinions. Defendant argues Dr. Melba's opinion was not entitled to controlling weight because it was inconsistent with the record and inconsistent with his own examination findings.

The Social Security Administration's regulations provide that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(c). Generally, more weight is given to the opinions of examining physicians than nonexamining physicians. More weight is given to the opinions of treating physicians since they are more likely to be able to provide a detailed, longitudinal picture of a claimant's medical impairment. *See* 20 C.F.R. § 404.1527(c). The medical opinion of a treating physician is entitled to controlling weight, i.e., it must be adopted by the ALJ, if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. *See* 20 C.F.R. § 404.1527(c)(2), SSR 96-2p, and *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence, it should be accorded significantly less weight." *Craig v. Chater*, 76 F.3d 585,590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating

physician in the face of persuasive contrary evidence." *Mastro*, 270 F.3d at 178 (citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)).

In determining what weight to give the opinions of medical sources, the ALJ applies the factors in 20 C.F.R. § 404.1527(c)(1)-(6), which are: whether the source examined the claimant; whether the source has a treatment relationship with the claimant and, if so, the length of the relationship and the frequency of examination; the nature and extent of the treatment relationship; the supportability and consistency of the source's opinion with respect to all of the evidence of record; whether the source is a specialist; and, other relevant factors. *See* SSR 96-2p; *Hines v. Barnhart*, 453 Fd 559,563 (4th Cir. 2006).

On September 11, 2013, Dr. Melba completed a work capacity and pain rating form. (Tr. 801). He indicated Plaintiff's pain level was moderately severe to severe and would interfere with: the ability to maintain concentration throughout a workday, stay on task for two consecutive hours, and the completion of a workday . (Tr. 801). Plaintiff could sit a total of two hours of a workday and stand for thirty minutes total and could not walk. (Tr. 802). From a choice of four statements, the statement "Pain is profound and intractable; it virtually incapacitates this individual" was selected. (Tr. 803). From a choice of four statements to answer the question to what extent physical activity increased pain, the statement "increase of pain to such a degree as to require increased medication for pain or substantial amounts of bed rest" was selected. (Tr. 803). "Significant side effects can be expected to limit the effectiveness of work duties or the performance of every day tasks as driving an automobile etc." was selected. To the question of what extent Plaintiff's pain and medication affects ability to work, "Patient will be totally restricted and thus unable to function at a productive level of work" was selected. (Tr. 804). Under the long term prospects of recovery,

"although the level of pain may be less intense or less frequent in the future, it will still remain a significant element in this individual's life" was selected. (Tr. 804). The only written comment by Dr. Melba was Plaintiff is unable to drive due to pain medication. (Tr. 804)

The ALJ found:

In 2013, the claimant saw Dr. Melba of Millstone Family Medicine to discuss disability forms. She described the severity of the injury as unable to sit for more than a few minutes, requires chro[nic] narcotic treatment. Dr. Melba said that after three years he thought it unlikely that her pain would improve much any in the future. He thought her claim for disability was well founded, as she was inoperable and was unable to function independently on her current medications (24F/3). He said she could sit for two hours (in 30-minute increments), Stan[d] for ½ hour (in 15-minute increments) and could do no walking, bending, or kneeling. Moderately severe to severe pain interfered with concentration, attention, and pace. She required more than usual breaks. She was unable to drive due to pain meds (21F).

For claims filed before March 27, 2017, 20 CFR 404.1527(c) states that if a treating source's medical opinion on the issues of the nature and severity of the impairments is well supported by medically acceptable clinical or laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, I will give it controlling weight. Unless I give a treating source's medical opinion controlling weight, I consider all of the factors in deciding the weight we give to any medical opinion. The factors include treatment relationship, examining relationship, supportability, consistency, specialization, and any factors the claimant or others bring to my attention, or of which I am aware, that tend to support or contradict the medical opinion

I do not give controlling weight to Dr. Melba's opinion because it is not well supported by medically acceptable clinical or laboratory diagnostic techniques and is inconsistent with the other substantial evidence in the record.

I do, however, assign some weight to this treating physician opinion on the basis of a longitudinal history. I do not assign it greater weight because he is a family practice physician and is not an orthopedic or neurological specialist and not a specialist in mental health treatment or pain management. It appears that with regard to her orthopedic impairments, his primary role was to provide and monitor medications. The opinion is rendered on a checkbox form with yes/no answers. The opinion appears to be influenced by the claimant's subjective reports of limitations; including her unsupported claims that MUSC (5F) found her pain to be "intractable." The opinion is inconsistent with the Dr. Melba's own treatment notes. Notably, he also

subsequently advised her that such questionnaires should be completed out by her treating pain management specialist, whom he felt better qualified to answer such questions (see 35F/325).

(Tr. 904-05).

The ALJ noted:

In August 2015 at Milestone, she asked John Melba, MD, to fill out disability papers. She was told that in the future she should direct such requests to pain management as they were managing her back pain (35F/274). His typical comment was that she had exacerbation of low back pain and he gave enough medication until she returned to pain management (35F/244).

(Tr. 902).

Plaintiff's history with Dr. Melba dates back to at least 2003. (Tr. 413). On August 27, 2013, Plaintiff was seen by Dr. Melba who noted that Plaintiff presented with:

back pain to the S1 joint, lumbar spine and lower thoracic spine radiating to the L hip which occurred years ago. The patient characterized it as aching pain. The patient described the severity of the injury as no better. [C]ontinues chiropractor/PT. The timing is gradual onset. Relieving factors were reported to be: minimal with pt, chiropractor. An associated sign and symptom is [n]one. [R]eports seen at MUSC by neurosurgery and told it was intractable. [C]ontinues to see pain mgt. [and] is seeking disability[.] I don't have much in the way of records at this point to substantiate her claim.
...
Has been dealing with back pain for over 3 years now. She had been under pain mgt care during this time as well. [H]as disability hearing coming up and needs forms filled out. I agreed to review her old records and will request from pain mgt. probably has true intractable back pain that is inoperable, will get records and review

(Tr. 860, 863). Examination showed pain with bending and unable to flex laterally. (Tr. 863). Assessment was "common migraine without mention of intractable migraine, new," depression, low back pain, and restless legs syndrome.

On September 11, 2013, Plaintiff was seen by Dr. Melba. He noted:

52

> back pain to the S1 joint, lumbar spine and lower thoracic spine radiating to the L
> hip, which resulted mva, and which occurred following MVA 2010. The patient
> characterized it as aching pain. The patient described the severity of the injury as
> unable to sit for more than a few minutes, requires chronic narcotic treatment. The
> timing is gradual onset. The following were described as aggravating factors:
> movement. Relieving factors were reported to be: minimal with pt, chiropractor. An
> associated sign and symptom is [n]one. MRI of T spine in 2010 showed multi level
> thoracic disc  disease with cord compression at multiple levels. Has been to POA,
> then to MUSC and seen by neurosurgery and told it was nonsurgical .[C]ontinues to
> see pain mgt. Has had trigger point injections, facet injections, and esi with minimal
> changes improvement in pain. Has been to PT and chiropractor as well with minimal
> changes in her pain.

(Tr. 857).   Examination showed thoracic tenderness, pain with forward flexing and lateral side

bending. (Tr. 859).   Assessment was "low back pain, stable."  (Tr. 859).   Plan was:

> at this point after 3 years of treatment consisting of ortho evals,  neurosurgical evals,
> pain mgt evals, numerous injections, physical therapy and chiropractic care I think
> it's unlikely that her pain will improve much, if any, in the future.  Further, I think
> her claim for disability is well founded as she is inoperable and is unable to function
> independently on her current medications.

(Tr. 859). Then, the same date, the forms by Dr. Melba were completed that are at issue.  (Tr. 801).

The ALJ addressed the factor of whether Dr. Melba was a specialist or not and noted Dr.

Melba did not receive greater weight because he was not a orthopedic, neurological, mental health,

or pain management specialist. The ALJ states Dr. Melba's opinion received some weight because

of the longitudinal treating history, a 20 C.F.R. § 404.1527(c) factor. Also, the ALJ gave less weight

to Dr. Melba's opinion because it was a check-the-box form.

However, as to the ALJ's statement that "intractable pain" having been found by MUSC was

unsupported and Dr. Melba's opinion regarding such pain was based on Plaintiff's report, Dr. Melba

did note that Plaintiff stated to Dr. Melba that MUSC told her it was intractable, then he stated

"probably has true intractable back pain that is inoperable, will get records and review." (Tr.  860).

53

Later, in September 2013, Dr. Melba notes Plaintiff stated she was told it was nonsurgical and under "plan," he noted "she is inoperable and is unable to function independently on her current medications." (Tr. 857, 859). In May 2013 and September 2013, a specialist Dr. Thiyaga stated: "She is on opioid maintenance therapy for chronic intractable pain." (Tr. 1257, 1249). Dr. Thiyaga also noted: "Patient is exaggerating her symptoms, wants services she does not need." (Tr. 1249). By October 2013, Plaintiff changed care from Dr. Thiyaga to Dr. Schiff and reported a pain level of 4. (Tr. 773). In December 2013, Dr. Tsoulfas found Plaintiff had limitation of activities due to pain. (Tr. 755). It does not appear that the factual finding regarding intractable pain is supported by substantial evidence.

Also, the ALJ's statement— that Dr. Melba stated that later questionnaires should be completed by treating pain management specialist indicated that Dr. Melba felt such specialist was better qualified to answer such questions— is not supported by substantial evidence. Dr. Melba stated in 2015 "Presents today to have disability forms filled out. In the future, she needs to have pain [management] fill these out as they are now managing her back [pain]." (Tr. 1752). There is a time implication in Dr. Melba's 2015 statement that is inconsistent with what the ALJ stated that in 2013 others were better qualified to complete forms.

Based on the foregoing, the court can not find that the ALJ's decision regarding the evaluation of Dr. Melba's opinion is supported by substantial evidence. Therefore, upon remand, the ALJ should analyze Dr. Melba's opinions in accordance with 20 C.F.R. § 404.1527(c) and with consideration of the factual inaccuracies discussed above.

### III.  CONCLUSION

The court is mindful of the age of this case and that this is the second remand.  Thus, the undersigned has taken great pause in deciding how to resolve this matter.[4]  Ultimately, the court is constrained by its limited function under 42 U.S.C. § 405(g).  Our function is to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case.  *See* 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).  As discussed above, the ALJ's decision is not based on substantial evidence.[5]

"We cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence." *Gordon v. Schweiker*, 725 F.2d 231, 235–36 (4th Cir. 1984)(citing *Myers v. Califano*, 611 F.2d 980, 983 (4th Cir.1980); *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir.1979); *Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir.1977)).  "The ALJ is not required to discuss every piece of evidence, but if he does not mention material evidence, the court cannot say his determination was supported by substantial evidence." *Seabolt v. Barnhart*, 481 F. Supp. 2d 538, 548 (D.S.C. 2007)(citing *Arnold v. Sec'y*, 567 F.2d 258, 259 (4th Cir.1977) ("The courts ... face a difficult

---

[4] The Fourth Circuit has reversed without remanding in cases where significant delay has resulted or would result from the Commissioner's failure to apply the correct legal standard. *See Coffman v. Bowen*, 829 F.2d 514, 519 (4th Cir.1987); *Taylor v. Weinberger*, 512 F.2d 664, 668 (4th Cir.1975).

[5] Remand, rather than reversal, is required when the ALJ fails to explain his reasoning and there is ambivalence in the medical record, precluding a court from "meaningful review." *Radford v. Colvin*, 734 F.3d 288, 296 (4th Cir.2013).

task in applying the substantial evidence test when the Secretary has not considered all relevant evidence. Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty....")).  Due to the errors in the ALJ's decision as to Listing 1.04A, it is appropriate to remand to the Commissioner for further action.

It may well be that substantial evidence exists to support the Commissioner's decision in the instant case. The court cannot, however, conduct a proper review based on the record presented. Pursuant to the power of the Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in social security actions under sentence four of Sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. Sections 405(g) and 1338(c)(3), the Commissioner's decision is reversed pursuant to sentence four of 42 U.S.C. § 405(g) and this case is REMANDED to the Commissioner for further administrative action as set forth above.

<br>

           s/Thomas E. Rogers, III

March 20, 2020                   Thomas E. Rogers, III
Florence, South Carolina        United States Magistrate Judge